Filed 12/13/22  P. v. Johnson CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>LACEDRICK DONTAI JOHNSON,<br><br>    Defendant and Appellant. | B314959<br><br>(Los Angeles County<br>Super. Ct. No. PA020188) |

APPEAL from an order of the Superior Court of Los Angeles County, Stephen A. Marcus, Judge.  Affirmed.

Matthew Missakian, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, David E. Madeo and William H. Shin, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

LaCedrick Dontai Johnson appeals the trial court's order denying his petition for vacatur of his murder conviction and resentencing under Senate Bill No. 1437 (Senate Bill 1437) and former Penal Code section 1170.95[1] (now § 1172.6),[2] following an order to show cause and hearing pursuant to subdivision (d)(3).

On appeal, Johnson contends there was insufficient evidence to support the trial court's findings that he (1) was a major participant in the underlying robbery and acted with reckless indifference to human life, and (2) intended to kill the victim. He further contends that the trial court failed to consider his youth when determining his guilt.

## FACTS AND PROCEDURAL HISTORY

In July, August, September, and October 1993, Johnson and his associates, including codefendants Etienne Moore and Shashonee Solomon, committed numerous "follow-home" armed robberies.[3] Johnson regularly met with Moore and several other friends during the summer and fall of 1993 and talked about committing armed robberies. Johnson and his cohorts would pick out people driving nice cars and follow them home to rob them. The robbers obtained guns and stole vehicles to use in the robberies. In several of the robberies Johnson and his cohorts beat or shot their victims. One of the robberies in which Johnson

---

[1] All further statutory references are to the Penal Code.

[2] Effective June 30, 2022, section 1170.95 was renumbered section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.)

[3] Moore and Solomon are not parties to this appeal.

was involved resulted in the shooting death of victim Laurie Myles.

***Robbery and Murder of Laurie Myles***

### Facts

J.M., who was nine years old at the time of his mother's killing, testified to the following at trial:  In the evening on September 15, 1993, J.M. and his mother, victim Laurie Myles, drove to pick up Myles's daughter from Bible study.  J.M. was sitting in the front passenger's seat.  The street was very dark, which made J.M. nervous.  While Myles was parking, a large yellow or tan car with its headlights off pulled up next to them.  A man got out of the passenger side of the car and stood on the driver's side of Myles's car.  Within seconds, J.M. heard his mother screaming.  J.M. saw a bullet-sized hole in the window, which shattered the glass.  Myles tried to drive away and ground the car's gears.  The man had his hands on the window and was pushing the car to keep Myles and J.M. from escaping.  The man demanded Myles's purse and a briefcase that was on the floorboard.  The man was holding a gun and punching the glass out of Myles's window with his elbow.  Myles was slumped over and was gasping for air, and her tongue was turning white.  She gave the man her purse, but could not hand the briefcase to him.  J.M. saw that his mother did not have the strength to hand over the briefcase, so he pushed it in the man's direction.  The man told Myles to hurry up or he'd shoot her in the head.  He reached into Myles's car, grabbed the briefcase, and threw it into his car.  The cars were very close to each other, and the man's car door

3

was open, so he did not have to move to get the briefcase into his car. The man got into his car and banged the door against Myles's car two or three times before driving away.[4] When the passenger side door of the man's car was open, it illuminated the car and J.M. was able to see the driver. The inside of the car was very bright. The driver looked right into J.M.'s eyes. J.M. sat back in his seat.

J.M. waited for the man's car to turn the corner before checking to see if his mother was alright. Myles's side was covered in blood, so J.M. climbed into her lap and tried to perform CPR. He also tried to put the car in gear and drive it, but was unsuccessful. J.M. flagged down a woman who was driving past to get help. She told him to wait, and she would be right back. She drove away and later returned with her husband. After the woman drove away, J.M. ran to the building where his sister was in Bible study and banged on the door, but got no answer. He ran back to the car and waited for his sister. The entire sequence of events "took a while." J.M. estimated it was five to 10 minutes before his sister came outside. It took longer for the fire truck to arrive and "the paramedics didn't show up until a while after."

The evidence established that Myles died of a single gunshot wound from a hollow point bullet that penetrated her arm, heart, diaphragm, and liver. Police recovered a .380 shell casing from the crime scene.

---

[4] J.M. later identified Moore as looking similar to the shooter.

## Interviews of Johnson

Los Angeles Police Department Detective Ishmael Aldaz interviewed Johnson after he was arrested in 1995. Johnson told Detective Aldaz that he had committed approximately 10 robberies. He said he committed approximately five of those robberies alone and five with other people. He was armed with a gun in every incident. Johnson said he purchased a .380 semiautomatic handgun in 1992. He and his cohorts would follow people who looked like they had money. They preferred to commit the robberies at night in poorly lit areas. Johnson loaned his gun to three other people. Detective Aldaz asked Johnson several questions about a .357 firearm and his own .380 firearm. When the detective asked Johnson if he knew why he was being asked so many questions about those specific guns, Johnson replied, "cause they have a lot of murders on them." Johnson told the detective that he loaned his firearm to another person, and when the person returned it a few days later, the person told Johnson that he had used it to blast a woman who was in a car with a little boy. The person who borrowed Johnson's gun told Johnson he should watch the news for the murder.

Los Angeles Police Department Detective Robert Bogison subsequently conducted another interview of Johnson. Initially, Johnson stated that he loaned his gun to someone the night of the Myles murder but that he was not involved or in the vicinity when Myles was killed. When the person who had borrowed Johnson's gun returned it the next day, that person indicated that he had killed someone with it.

Later in the interview with Detective Bogison, Johnson admitted that he was the driver in the Myles robbery and

murder. Johnson had stolen a yellow Cadillac Fleetwood several hours before the murder and had used the Cadillac in the robbery. Johnson spotted Myles's car going down a dark street. He turned off the Cadillac's headlights, which was his practice in robberies. He parked right next to Myles's car and made sure to be close enough that if his cohort opened the Cadillac's passenger door it would hit Myles's car. Johnson's cohort got out of the Cadillac, and very soon afterward the glass of Myles's driver side window shattered. Johnson could see Myles screaming and hear her car's gears grinding. Her car lurched forward. Johnson's cohort took a purse and a briefcase out of Myles's car. Johnson thought he heard his cohort say, "Give me your shit, woman." Johnson knew Myles had been shot when he saw her slumped over the steering wheel. Johnson told the detective that there was a little boy between the ages of five and seven in the car with Myles. The child was looking at Johnson. Johnson drove away from the scene quickly. He told Detective Bogison that Myles was shot because she panicked and did not cooperate. Johnson's cohort took a briefcase, $100, and some checks from Myles's car. After the robbery, Johnson parked the Cadillac and wiped it down so that there would not be any fingerprints. Johnson directed Detective Bogison to the location where Myles had been shot.

Johnson told Detective Bogison that the Myles murder was the second time he had been involved in a robbery where someone had been shot. The first time, an older gentleman had been shot in Johnson's presence. Johnson admitted that he shot at two young women who pursued him after he stole their car, but he claimed that he did not mean to hit them. Johnson also admitted that his gun had been used to shoot a police officer.

Johnson told the detective of one occasion on which he and a cohort followed a young man in a car. Johnson's cohort approached the man with Johnson's gun. The cohort later told Johnson the young man had been shot in the stomach. Johnson also told the detective that he was involved in an incident in which an older man was shot.

### Moore's Jail Call Admission

While in jail, Moore called a woman he had dated and mentioned a robbery and shooting that involved a little boy and took place in a vehicle. The woman was familiar with the robbery and murder because she had heard about it on the news. Moore said the victim had not moved quickly enough. He also said something like, "I took out someone's mother." Moore admitted to a friend that he had to "blast a bitch" who was screaming, and that somebody else wanted to shoot the kid.

*Trial*

At trial, the prosecution argued that Johnson was guilty of felony murder. Evidence of numerous crimes that Johnson and Moore allegedly committed together was introduced as proof of overt acts to support the conspiracy charges against both men. Evidence was presented that prior to the robbery and murder of Myles: Moore shot a man in the stomach in a robbery in which Johnson was the getaway driver; Johnson shot at two women who pursued him after he stole their car; Johnson shot a hole in the front door of a house while he was robbing a man; and Johnson and Moore robbed, brutally beat, and shot a man.

7

The prosecution also presented evidence of Johnson and Moore's co-participation in several violent robberies after Myles's death, including one in which Johnson and Moore robbed a man at gunpoint (Moore held a gun to the man's head and pulled the trigger but the gun jammed); Johnson and others attempted to rob a woman and one of Johnson's cohorts shot at her; and Johnson's gun was used to shoot an off-duty police officer who intervened in a robbery in which Moore was involved. The prosecutor further presented evidence that both Johnson and Moore were involved in the robbery of Talin Kara Tarkhanian, in which Moore killed Tarkhanian.

Johnson was convicted of one count of conspiracy to commit robbery (§§ 182, subd. (a)(1), 211; count 1), murder (Myles) (§ 187, subd. (a); count 2), and two counts of second degree robbery (Myles and Tarkhanian) (§ 211; counts 3 & 6). In count 2, the jury found true a robbery murder special circumstance. (§ 190.2, subd. (a)(17).) The jury found true the allegation in count 6 that a principal used a firearm. (§ 12022, subd. (a)(1).) Johnson was sentenced to life without the possibility of parole plus six years.

### *Petition for Resentencing*

On February 6, 2019, Johnson petitioned for resentencing under former section 1170.95. The trial court appointed counsel. On February 23, 2021, the prosecution filed a response stating that it did not oppose issuance of an order to show cause. The court found that Johnson had made a prima facie showing of eligibility for resentencing, issued an order to show cause, and set a hearing. Johnson filed a reply in support of his petition on March 23, 2021.

The court held a hearing on the resentencing petition on August 30, 2021. Johnson waived his right to be present. The parties relied on the record of conviction and did not submit new or additional evidence. The court denied the petition, finding beyond a reasonable doubt that Johnson was guilty of Myles's murder as a major participant in the underlying robbery who acted with reckless indifference to human life. The court further found beyond a reasonable doubt that Johnson intended to kill Myles and was a direct aider and abettor to murder.

**DISCUSSION**

***Section 1172.6***

" 'In 2017, the Legislature adopted a concurrent resolution declaring a need to reform the state's homicide law "to more equitably sentence offenders in accordance with their involvement in the crime." [Citation.] The next year, the Legislature followed through with Senate Bill 1437, which made significant changes to the scope of murder liability for those who were neither the actual killers nor intended to kill anyone, including certain individuals formerly subject to punishment on a felony-murder theory.' (*People v. Strong* (2022) 13 Cal.5th 698, 707 (*Strong*).)

" '. . . Senate Bill 1437 significantly limited the scope of the felony-murder rule to effectuate the Legislature's declared intent "to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." [Citations.] . . . section 189,

as amended, now limits liability under a felony-murder theory principally to "actual killer[s]" ( . . . § 189, subd. (e)(1)) and those who, "with the intent to kill," aid or abet "the actual killer in the commission of murder in the first degree" (*id.*, subd. (e)(2)). Defendants who were neither actual killers nor acted with the intent to kill can be held liable for murder only if they were "major participant[s] in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of . . . [s]ection 190.2"—that is, the statute defining the felony-murder special circumstance. ( . . . § 189, subd. (e)(3).)' (*Strong*, *supra*, 13 Cal.5th at p. 708.)'

" 'Senate Bill 1437 also created a special procedural mechanism for those convicted under the former law to seek retroactive relief under the law as amended. [Citations.] Under newly enacted section 1172.6, the process begins with the filing of a petition containing a declaration that all requirements for eligibility are met (*id.*, subd. (b)(1)(A)), including that "[t]he petitioner could not presently be convicted of murder or attempted murder because of changes to . . . [s]ection 188 or 189 made effective January 1, 2019," the effective date of Senate Bill 1437 (§ 1172.6, subd. (a)(3)).' (*Strong*, *supra*, 13 Cal.5th at p. 708, fn. omitted.)" (*People v. Keel* (2022) 84 Cal.App.5th 546, 555.)

Upon receipt of a petition meeting these requirements, the trial court will appoint counsel, if requested. (§ 1172.6, subd. (b)(3).) The prosecutor must file a response within 60 days of the service of the petition, and the petitioner may file a reply within 30 days of the response. (§ 1172.6, subd. (c).) When briefing has been completed, "the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief. If the petitioner makes a prima facie showing that the

10

petitioner is entitled to relief, the court shall issue an order to show cause. If the court declines to make an order to show cause, it shall provide a statement fully setting forth its reasons for doing so." (*Ibid*.) Within 60 days of issuance of the order to show cause, the trial court shall hold a hearing "to determine whether the petitioner is entitled to relief." (§ 1172.6, subd. (d)(3).)

"At the hearing . . . the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder . . . under California law as amended by the changes to [s]ection 188 or 189 made effective January 1, 2019. . . . The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens. . . . If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (§ 1172.6, subd. (d)(3).) The trial court acts as the finder of fact when determining whether the prosecution has met its burden beyond a reasonable doubt. (See *People v. Gentile* (2020) 10 Cal.5th 830, 855 [section 1172.6 "requires the superior court to determine on an individualized basis, after considering any new or additional evidence offered by the parties, whether the defendant is entitled to relief"], superseded by statute on another ground as stated in *People v. Birdsall* (2022) 77 Cal.App.5th 859, 868.)

We review the trial court's factual findings for substantial evidence. (*People v. Clements* (2022) 75 Cal.App.5th 276, 298; *People v. Ramirez* (2021) 71 Cal.App.5th 970, 985.) "The scope of our review for substantial evidence is well settled. The test is not whether the People met their burden of proving beyond a

11

reasonable doubt that [the defendant] was ineligible for resentencing, but rather 'whether *any* rational trier of fact could have' made the same determination, namely that '[t]he record . . . disclose[s] . . . evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find [as did the superior court]. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the [order] the existence of every fact the [superior court] could reasonably have deduced from the evidence. [Citation.] "Conflicts [in the evidence] . . . subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge . . . to determine the . . . truth or falsity of the facts upon which a determination depends. [Citation.]" ' (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)" (*People v. Williams* (2020) 57 Cal.App.5th 652, 663.)

### *Analysis*[5]

### **Major Participant**

In determining whether the defendant was a major participant in the underlying felony, "the ultimate question [is]

---

[5] The People devote the majority of their brief to the argument that a jury's special circumstance finding made prior to our Supreme Court's issuance of *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*) bars Johnson from eligibility for relief under section 1172.6. The Supreme Court rejected this position in *Strong*, *supra*, 13 Cal.5th 698. *Strong* also rejected the People's argument that this court may determine a defendant is ineligible for relief because the evidence is sufficient to support the jury's

whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major' [citations.]" (*Banks*, *supra*, 61 Cal.4th at p. 803.) To do so, we consider multiple factors, including: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Ibid.*, fn. omitted.) "No one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Ibid.*)

Substantial evidence supports the trial court's finding that Johnson was a major participant in the robbery of Myles. First, the trial court could reasonably infer that Johnson participated in planning Myles's robbery. Evidence was presented that in the summer and fall of 1993, Johnson, Moore, and others got together on a regular basis and discussed numerous robberies. Johnson admitted to Detective Bogison that he routinely followed victims driving down dark streets and turned off his headlights when he committed a robbery. Myles's robbery was consistent with Johnson's usual practices.

---

major participant and reckless indifference findings as a matter of law. (*Id.* at pp. 719–720.)

13

Second, evidence was presented that Johnson supplied the .380 firearm Moore used to kill Myles. Johnson owned a .380 firearm that had "a lot of murders on [it]." He admitted to Detective Aldaz that he loaned the gun to a friend who used it to shoot a woman who was in a car with a little boy.

Third, the evidence supports the conclusion that Johnson was well aware of the particular dangers posed and Moore's propensity for violence. Johnson and Moore participated in multiple robberies. Johnson stated that he was always armed with a gun during a robbery. Moore previously shot a victim during a robbery when Johnson was present, and Johnson himself had shot at victims in the course of a car theft. Although no one had yet been killed in one of their joint robberies, both men had discharged firearms in the course of robberies, and their actions could have easily resulted in the death of a victim.

Fourth, Johnson was present at the scene of the murder. He facilitated the killing by preventing Myles's escape, using a stolen car to box her in. He did nothing to prevent Myles's death.

Finally, Johnson stated that he knew Myles had been shot because of the way she was slumped over the steering wheel, but he did nothing to assist her. Instead, he enabled Moore's escape by driving him away from the scene in the stolen Cadillac, and helped Moore evade detection by taking care to wipe the Cadillac clean of fingerprints.

Every factor that we assess to determine whether a defendant's participation in a robbery is sufficiently significant to be considered "major" militates against Johnson. Johnson was integrally involved in executing the robbery. It was Johnson who identified Myles as the target and pursued her down a dark street. Johnson stole a Cadillac for the purpose of committing the

14

robbery and used it to box Myles's car in and prevent her from escaping. Johnson wiped the Cadillac clean of fingerprints to avoid detection.

We are not otherwise persuaded by Johnson's argument that his case is analogous to *In re Bennett* (2018) 26 Cal.App.5th 1002. In *Bennett*, the appellate court held the defendant's participation was not major because it was no greater than the actions of an ordinary aider and abettor in a felony murder. (*Id.* at p. 1021.) As Johnson asserts, in *Bennett*, the defendant "identified the victim, used his prior connection with the victim to arrange a pretextual drug buy, drove to the meeting with his accomplices to facilitate the robbery, was near the scene during the fatal shooting, and drove the group away." The circumstances are similar in Johnson's case, but there are additional factors that support the trial court's major participant finding here. As the Court of Appeal emphasized, in *Bennett* there was no evidence to indicate the defendant was aware of the violent nature of his cohorts, who pursued and killed the victim. (*Id.* at p. 1020.) Here, there was significant evidence that Johnson had participated in violent crimes with Moore and had witnessed him shooting a victim before the Myles murder. He was well aware that Moore was capable of shooting a victim, but supplied him with a firearm, nonetheless. In *Bennett*, the defendant was across the street when the shooting occurred. (*Id.* at pp. 1008–1009.) He did not know that his cohorts were pursuing the victim, and did nothing to aid them in their pursuit. (*Ibid.*) The defendant did not know the victim had been shot until he had driven his cohorts away from the scene. (*Id.* at p. 1009.) He therefore had no opportunity to prevent the shooting or render aid. In contrast, Johnson was only feet away

15

when Moore shot Myles. Even assuming that the shooting happened too quickly for Johnson to prevent it, he admitted that he knew Myles had been shot, yet he prevented her escape and did not render aid. These are significant differences. Johnson was aware of the high potential that a victim could be killed and participated in the robbery in ways that facilitated the killing.

### Reckless Indifference

" 'A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.' (Model Pen. Code, § 2.02, subd. (2)(c).)" (*Clark, supra*, 63 Cal.4th at p. 617.)

"This definition encompasses both subjective and objective elements. The subjective element is the defendant's conscious disregard of risks known to him or her. But recklessness is not determined merely by reference to a defendant's subjective feeling that he or she is engaging in risky activities. Rather, recklessness is also determined by an objective standard, namely what 'a law-abiding person would observe in the actor's situation.' (Model Pen. Code, § 2.02, subd. (2)(c).)" (*Clark, supra*, 63 Cal.4th at p. 617.)

"In determining whether [the defendant] exhibited 'reckless indifference to human life' within the meaning of section 190.2,

16

subdivision (d)," "we consider the specific facts of [the] case in light of some of the case-specific factors that this court and other state appellate courts have considered in upholding a determination of reckless indifference to human life in cases involving nonshooter aiders and abettors to commercial armed robbery felony murders. . . . '[N]o one of these considerations is necessary, nor is any one of them necessarily sufficient.' (*Banks, supra*, 61 Cal.4th at p. 803.)" (*Clark, supra*, 63 Cal.4th at p. 618.) These factors include: (1) knowledge, use, and number of weapons; (2) physical presence at the crime and opportunity to aid the victim; (3) the duration of the felony; (4) the defendant's knowledge of the likelihood of killing; and (5) the defendant's efforts to minimize the risk of violence during the felony. (*Clark, supra*, 63 Cal.4th at pp. 618–622.)

Substantial evidence supports the trial court's finding that Johnson acted with reckless indifference to human life. Many of the same facts relevant to the major participation inquiry are relevant here as well. First, as we have stated, it can be reasonably inferred that Johnson supplied Moore with the gun that killed Myles, and therefore had knowledge that a gun could be used. Second, Johnson was present when Myles was shot and aware that she had been shot, but did not attempt to aid her. Third, Johnson had seen Moore shoot a robbery victim previously and would have understood that Moore could shoot again. Fourth, Johnson did nothing to minimize the risk of violence. He stole a car and parked it in a manner that prevented Myles's escape. His actions facilitated the killing.

Although the felony was of short duration, this single factor does not outweigh the other factors that support the trial court's finding of guilt. Even if he did not have time to prevent the

17

shooting, Johnson could have helped.  Instead, he allowed Moore to continue with the robbery.  Johnson could have called paramedics, but he chose to leave the responsibility of medical treatment on the shoulders of Myles's young son, who had just witnessed his mother screaming and struggling to comply with the robbers after being shot.

We are not persuaded by Johnson's argument that his own youth at the time of the crime weighs heavily in favor of the conclusion that he did not act with reckless indifference to human life.  The trial court considered the fact that Johnson was 19 at the time of the robbery and murder.  The court ruled, "[W]hen you look at all the robberies he committed and all the important steps that he took in these robberies, this was not a situation where someone made a mistake of judgment on one occasion and maybe were influenced by their immaturity or something."  "This is someone who was into this robbery thing full blast.  He was someone that was involved and had a role and performed that role."  The court believed that a defendant's maturity could be a factor with respect to his understanding of his cohorts' propensity for violence, but the court concluded, "I believe he completely understood that."  Substantial evidence supports the court's inferences with regard to Johnson's conduct and thinking, despite his youth.[6]

[6] Given our conclusion to affirm the court on the ground that Johnson was a major participant in the robbery and acted with reckless indifference to human life, we need not review the court's alternative ground for denying the petition to vacate the murder conviction, that Johnson intended to kill Myles and was a direct aider and abettor to murder.

18

## DISPOSITION

We affirm the trial court's order.
NOT TO BE PUBLISHED.


MOOR, J.

We concur:


RUBIN, P. J.


KIM, J.